BARRETT LINE, INC. *v.* UNITED STATES ᴇᴛ ᴀʟ.

No. 630.  Argued April 2, 1945.—Decided June 18, 1945.

*Mr. Robert E. Quirk* for appellant.

*Mr. Walter J. Cummings, Jr.,* with whom *Solicitor General Fahy, Messrs. Daniel W. Knowlton* and *Allen Crenshaw* were on the brief, for the United States and the Interstate Commerce Commission; and *Mr. Harry C. Ames,* with whom *Messrs. Wilbur La Roe, Jr.* and *R. Granville Curry* were on the brief, for the American Barge Line Co. et al., appellees.

Mr. Justice Rutledge delivered the opinion of the Court.

The Interstate Commerce Commission denied appellant a permit to act as a contract water carrier under the Transportation Act of 1940, 54 Stat. 898, Part III of the Interstate Commerce Act. A three-judge District Court dismissed the complaint which sought review of that order. The appeal is from this judgment.

In May, 1941, appellant applied for a permit to carry general commodities, with exceptions not now material, between points on the Mississippi River and its tributaries. The authority sought was to "continue an operation in existence January 1, 1940, and continuously thereafter," as a contract carrier of property over irregular routes, pursuant to "grandfather rights" claimed under § 309 (f) of Part III.[1] A year later, while the grandfather application was pending, appellant filed another application as a precautionary measure. This sought, in the alternative, leave to perform the same service as a new

---

[1] Section 309 (f) provides in part:

"Except as otherwise provided in this section and section 311, no person shall engage in the business of a contract carrier by water unless he or it holds an effective permit, issued by the Commission authorizing such operation: Provided, That, subject to section 310, if any such carrier or a predecessor in interest was in bona fide operation as a contract carrier by water on January 1, 1940, over the route or routes or between the ports with respect to which application is made, and has so operated since that time (or, if engaged in furnishing seasonal service only, was in bona fide operation during the seasonal period, prior to or including such date, for operations of the character in question) except, in either event, as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such permit, without further proceedings, if application for such permit is made to the Commission as provided in subsection (g) . . ." 49 U. S. C. § 909 (f).

Section 310 relates to dual operation as common and contract carrier, § 311 to temporary operations.

operation "consistent with the public interest and the national transportation policy" under § 309 (g).[2]

Protests were filed by other carriers and the two applications were heard together before an examiner in September, 1942. He concluded that the showing did not warrant granting of the grandfather application, but recommended granting of the permit under § 309 (g). Division IV however denied both applications, that under § 309 (f) for failure to make the required showing of actual operations on and after the crucial date, the one under § 309 (g) on the ground that appellant had "failed to show that it is proposing any new operation, or that a new operation by it would be consistent with the public interest or the national transportation policy, or that present or future public convenience and necessity require such operation." A petition for reconsideration by the full Commission was denied and the District Court adopted its findings and conclusions in a *per curiam* opinion.

The evidence consisted of exhibits and the testimony of appellant's president, Barrett. The story is of an old-style

---

[2] Section 309 (g) provides:

". . . Subject to section 310, upon application the Commission shall issue such permit if it finds that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that such operation will be consistent with the public interest and the national transportation policy declared in this Act. The business of the carrier and the scope thereof shall be specified in such permit and there shall be attached thereto at time of issuance and from time to time thereafter such reasonable terms, conditions, and limitations, consistent with the character of the holder as a contract carrier by water, as are necessary to carry out the requirements of this part or those lawfully established by the Commission pursuant thereto: Provided, however, That no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his equipment, facilities, or service, within the scope of the permit, as the development of the business and the demands of the carrier's patrons shall require." 49 U. S. C. § 909 (g).

family institution which, for four generations, has had part in life on the Mississippi and its tributaries. As told by Captain Barrett, the line not only pioneered in the great development of inland water transportation of the middle nineteenth century. Its history has been constantly, during this century, one of pioneering in various fields of water transportation. And thereby, the inference seems justified, hangs the reason for its survival in an age when water transportation, like so much else of industry, has been taken over largely by corporate or governmental enterprise. Now the vicissitudes of regulation have been added to those of competition, appellant urges, to threaten its continuance.

The concern, incorporated in 1926 as successor to individual and partnership forms of operation, remains small. At the time of the hearing it owned twenty-one barges and two towboats, with two derrick boats and other equipment. Cincinnati is the port of registration; Cairo, Illinois, the situs of the fleet by reason of its accessibility to conjunctions of many rivers.

Operations historically have been highly selective and varied in character. Since 1910, at any rate, they have been limited generally to bulk materials, the greater number of which may be subjected to exposure to weather without damage, such as scrap iron, pig iron, fabricated steel, piping, bauxite ore, coal, paving brick, and stone, excluding such items as furniture. At one time or another, however, automobiles, sulphur, powder, grains, salt and petroleum products have been carried. So far as appears, the line has not held itself out in this period as a common carrier and does not now seek to become one. Its business has been strictly by special contract, negotiated with reference to the season, the course of the river required for the operation, times of loading and unloading, and other special factors. It is, in other words, an irregular operator performing what it characterizes as "special and

sporadic services under special contracts and conditions." The sporadic as well as the special character of the service becomes important, as will appear, for appellant's position on the issues.

The nature of the service and the character of the equipment are correlated. The barges are of steel construction, designed to carry dry or liquid cargo, the latter by adding piping and fittings when required. At the time of the hearing, nine had been converted in this way and were used in petroleum traffic, three by appellant and six under charter to the Standard Oil Company of Ohio. Of those remaining, six were under charter, to be converted to petroleum carriers; two were being used in carriage of coal; and four were "available for such use as we put them to." Captain Barrett testified that if the movement of petroleum products should cease the tankers readily could be reconverted for hauling dry cargo.

The service includes freighting, either with appellant's own barges and power or by towing barges owned by others. In addition appellant engages in chartering, including the leasing or chartering of equipment, at times with crew, to others. The chartering, according to Captain Barrett, involves "wide ramifications," often with difficulty in determining "just who is the operator, whether it is the shipper who is responsible, and therefore, the operator, or whether it is the carrier, who furnishes the equipment."

To establish its right to a permit, whether "grandfather" or "new operation," appellant offered evidence consisting of an exhibit listing all of its operations from January 1, 1936, to August 11, 1942, with information concerning the name of the customer, origin and destination, and nature of the cargo. No effort was made to prove specific operations in similar detail prior to the former date. But a written "Statement of the History,

Type and Scope of Operations and Services of The Barrett Line, Inc.," substantiated by the testimony of Captain Barrett, described in a general way the character and scope of such movements.

The general effect of the historical evidence was to show the varied and sporadic character of the operations from about 1910. It appeared that the company might be without contracts or business for intervals of several months at a time. Much of its activity was in the nature of "pioneering trades." In brief this consisted in demonstrating the feasibility of water transportation for particular commodities. Generally, when the demonstration had been made, the result was for the shipper or another to take over the operation and appellant then would await or seek another similar opportunity.[3]

The evidence, being general in character, was lacking to a large extent in dates concerning specific operations during the latter part of the period; so that for some ten or twelve years prior to January 1, 1936, it is difficult to gather what specific kinds of movements were being made, for whom, between what points and with reference to what materials. However, the general inference would seem justified that any suited to the equipment and the rather

---

[3] Thus, according to the testimony, the line pioneered in the transportation by water of petroleum in 1912 or earlier; of steel pipes from Pittsburgh in 1920; of powder in the same year; of automobiles to points downstream from Pittsburgh and Cincinnati; of bauxite ore for the Aluminum Ore Company; of paving brick to New Orleans; of riprap stone used by the Engineer Corps for paving river banks, etc.

Frequently the demonstration resulted in appellant's supplying equipment to the shipper when the latter took over the business as, for instance, when the Standard Oil Company of Louisiana purchased boats and barges to continue the demonstrated petroleum operation with its own fleet. Other instances included sales to Atlas Cement Co. and Carnegie Steel Co.

Miscellaneous services also were rendered to other carriers, before and after 1936, including relief of grounded or disabled vessels, raising of sunken vessels, storage of barges or vessels, etc.

indefinite criteria used for negotiating contracts were taken when opportunity offered; otherwise the fleet remained idle.

On the other hand, the evidence supplied by the exhibit concerning movements between January 1, 1936, and August 11, 1942, is much more definite. In all instances where the specific character of the cargo is mentioned, except one shipment of fabricated steel and piling in 1936, either stone or petroleum products, including gasoline and furnace oil, exempt commodities, are mentioned. A very considerable number of items designate "Miscellaneous Cargo" and there were some 44 instances noted simply as "charter," without reference to character of the cargo, including 23 in which equipment was leased or chartered to shippers not carriers subject to the Act. A few items specified vessel storage, "damaged barge," steamer aground, furnishing steam and like services to other carriers. In two instances "towing" was specified for "U. S. Engineers."

The "miscellaneous cargo" items largely involved towing loaded barges of other carriers, including the American Barge Line and the Mississippi Valley Barge Line. In some instances Barrett identified the specific cargoes, as, for example, a movement of the former company's barges loaded with scrap iron, sugar and molasses and some of the latter's bearing packaged freight. In such cases, however, since only motive power was furnished, and to another carrier, appellant disclaimed relying upon the movements "to establish that he [it] is a *common* carrier of general commodities," but put them in "to show the general sweep and character of the service performed" as a contract carrier. Barrett testified that appellant did not always know what was in such barges, that the charges were on a per diem basis and it therefore made no difference to appellant what was in the barges.

The difference, if any, between this towing and chartering when labelled as such is somewhat nebulous, if indeed

it is at all material. But concerning the latter the witness gave similar testimony: that appellant's charges, whether for motive power, barges or both, were on a per diem basis, except in one instance specifying a barrel rate; and that appellant was not concerned with the character of the cargo or where the boats went, although the company's trip sheets, not presented in evidence, would show the latter.

The only evidence, apart from the exhibit, as to operations after January 1, 1940, consisted in Barrett's testimony, summarized above, relating to appellant's equipment and its use at the time of the hearing. This, as may be recalled, related exclusively to transportation of petroleum products, directly or under charter; the use of two barges for carrying coal; the availability of four others "for such use as we put them to."

It should be added that, according to the evidence, one factor inducing the concentration upon petroleum products after 1940 was the effect of the war emergency upon the carriage of these products from southwestern producing fields to central and eastern communities, together with encouragement the line received from officials of the Government to convert its barges into tankers and engage in this business. It seems obvious that, with return to normal modes of transportation as the war emergency passes, and the development of new facilities accelerated by it, the life span of this concentration is likely to repeat appellant's typical "pioneering" performance.

Appellant and the Commission are at odds upon the effects of the showing made concerning movements on and after January 1, 1936, and as to whether the Commission erroneously refused to take account of earlier ones shown by the history prior to that time. The Commission thought that it should disregard them, more particularly with reference to the "grandfather" applica-

tion, as being too remote to substantiate the claim of "bona fide operation" on the crucial date within § 309 (f) ;[4] and found that the movements shown after January 1, 1936, were insufficient to establish the claimed rights because all, except one, were of exempt commodities, including petroleum products which were the only ones carried after January 1, 1940, except coal, which also is exempt.

Caught between the upper and nether millstones, so to speak, of denial of "grandfather" rights and a permit for new operations,[5] appellant questions the Commission's limitation of evidence to be considered to that affecting operations after January 1, 1936; its evaluation of the evidence taken into account, particularly that relating to chartering, as showing transportation of exempt commodities only; its interpretation of the statutory provisions in their bearing upon these issues, especially as requiring a showing that chartering operations include nonexempt commodities to justify issuance of a permit; its conclusion that the showing was not sufficient to support the application for "grandfather" rights; and the further conclusions

---

[4] The opinion of Division IV stated: "The term 'bona fide operations' has been interpreted to mean a holding out substantiated by actual operations consistent therewith. Actual operations in order to substantiate a claimed holding out on January 1, 1940, must have been within a reasonable length of time from that date. What constitutes a reasonable length of time may vary with the particular circumstances in each proceeding but one shipment made in 1936 and others at an indefinite period of time prior thereto are entirely too remote to establish bona fide operations on January 1, 1940, and continuously since."

[5] The grandfather rights were denied, of course, because in the Commission's view, the operations shown to sustain them were too far removed in the past. On the other hand, the permit for new operations was denied, according to its brief, because "appellant proposed no change in mode of operation but planned to continue doing business as in the past."

concerning the showing as affecting the application to perform new operations.

The short effect of appellant's position is that the Commission's action has limited it to transportation of exempt commodities only and that, if so limited, grave injury will result for its business. It maintains that, in view of its history and the facts properly interpreted, it is entitled to a permit for the transportation of commodities generally, throughout the Mississippi system, including its tributaries, and that the permit preferably should be under the grandfather clause; if not, then for a "new operation."

The controversy has become most crucial in relation to chartering. The Commission found that these activities related, in the crucial period and on the showing made, only to exempt commodities, for carriage of which authority is not required,[6] and concluded that appellant was therefore not engaged in chartering operations subject to Part III or entitled to a permit for them. The opinion stated: ". . . the only transportation which might be subject to regulation under part III was that of chartering of vessels to shippers. However, no showing is made as to the nature of the services rendered, the commodities carried in, or the points served with such vessels. On such meager showing we would not be warranted in finding that applicant, on January 1, 1940, and continuously since, was engaged in chartering operations subject to part III of the act."

---

[6] Exemption is provided by § 303 for various kinds of transportation including, under limitations specified, carriage of bulk commodities when the vessel is used to transport not more than three, § 303 (b); carriage of liquid cargoes in bulk in certified tankers, § 303 (d); transportation solely within the limits of a single harbor, § 303 (g).

The Commission has uniformly denied permits or certificates where only exempt transportation is involved. Cf. *Upper Mississippi Towing Corp., Common Carrier Application*, 260 I. C. C. 292, 293; *Gallagher Bros. Sand & Gravel Corp., Contract Carrier Application*, 260 I. C. C. 224, 225.

Appellant attacks this finding and the conclusion as contrary to law. The argument is founded upon § 302 (e), which defines "contract carrier by water" and provides that the furnishing of a vessel under charter or lease to a person other than a carrier subject to the Act, for use in transporting the latter's property, shall be considered to constitute "engaging in transportation" within the meaning of the definition of "contract carrier by water." [7]

Although it is true that no permit is required if only exempt commodities are carried in chartered vessels, appellant construes § 302 (e) to entitle it to a permit if on the crucial date it was engaged in bona fide chartering operations, without regard to whether the commodities actually carried were exempt or nonexempt. In this view the Act is not concerned, so far as it relates to chartering, with the character of the commodity, but takes account only of the furnishing of the vessel; and the Commission, by requiring a showing as to the nature of the commodity, added a requirement not included or authorized by the statute.

Accordingly, since the evidence clearly disclosed numerous charter operations within the critical period, appellant draws two conclusions: (1) that it was entitled to grandfather rights for chartering, as such, and to a

---

[7] Section 302 (e) in pertinent part is as follows:

"The term 'contract carrier by water' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (d) and the exception therein) by water of passengers or property in interstate or foreign commerce for compensation.

"The furnishing for compensation (under a charter, lease, or other agreement) of a vessel, to a person other than a carrier subject to this Act, to be used by the person to whom such vessel is furnished in the transportation of its own property, shall be considered to constitute, as to the vessel so furnished, engaging in transportation for compensation by the person furnishing such vessel, within the meaning of the foregoing definition of 'contract carrier by water'." 49 U. S. C. § 902 (e).

permit for such operations which would allow it to charter vessels for carriage of nonexempt as well as exempt cargo, without reference to its character in this respect; and (2), this being so, it was "engaged in transportation" of both exempt and nonexempt commodities on the critical date and therefore, under the Commission's rulings relating to such situations, was entitled to a permit authorizing not only chartering but also transportation of commodities generally.

Appellant relies especially upon the Commission's decision in *C. F. Harms Co., Contract Carrier Application*, 260 I. C. C. 171, rendered January 4, 1944, after the complaint had been filed in this cause; [8] with emphasis also upon *Russell Bros. Towing Case*, 250 I. C. C. 429, and *Moran Towing & Transportation Co. Case*, 250 I. C. C. 541; 260 I. C. C. 269.

In these cases permits were granted either to a "furnisher of vessels" or to towers without limitation as to commodities, on the basis of such a holding out, except that in the *Moran* case the tower had no official knowledge of the contents of the loaded barges. Appellant regards these decisions as inconsistent with the Commission's action in this case. The Commission distinguishes them, however, on the basis that the evidence disclosed operations affecting both exempt and nonexempt goods. The intervening protestants characterize appellant's "strategy," particularly in its reliance upon the *Russell Bros.* case, as follows: "It hopes first to have itself made subject to the act as a 'furnisher of vessels' and, having established that finger-hold, to bring to its aid the doctrine of the *Russell Bros.* case that *both* regulated and unregulated activities should be considered in determining rights."

---

[8] Three decisions were rendered in the *Harms* matter. The first gave authority to furnish vessels limited to scrap iron and to specified ports, 250 I. C. C. 513; the second removed the commodity limitation, 250 I. C. C. 685; the third, by the full Commission, removed the "territorial" limitation, 260 I. C. C. 171.

If the Commission's premise were valid, that a furnisher of vessels must show, as of the critical date, that his operations included nonexempt commodities or, as its opinion stated, "the nature of the services rendered, the commodities carried in, or the points served with such vessels," we would nevertheless be in doubt concerning the validity of its ruling that no sufficient showing was made in this case.

Appellant's exhibit disclosed 43 or 44 chartering operations in the period taken by the Commission as evidential, designated simply as "charter." All but two specified Cairo, Illinois, as both origin and destination. In the brief it is suggested these were therefore exempt under § 303 (g) relating to transportation in a single harbor. The suggestion flies flatly in the face of the uncontradicted testimony given by Captain Barrett that Cairo was designated in these instances because it was the situs of the fleet, appellant was chartering or leasing the equipment on a per diem basis, was therefore not interested in the contents or character of the cargo or where the vessel went, and that these operations were not confined to the Cairo harbor but that point was designated because it was the place where the movement began and the equipment was delivered when it ended. The effect of this evidence is not nullified, as seems to be suggested in the brief, because the witness also testified that the chartered vessels were run with appellant's crews, the masters were handed manifests disclosing the cargoes carried, and the trip sheets would reveal where the vessels went. Any other than the most rigid construction would regard those facts as supporting, rather than impairing, the claim of engaging in general chartering operations without limitation to exempt commodities or particular points of loading and unloading.

Similar restrictive inferences are drawn in the brief to support "probable exemptions" in nearly all the other in-

stances of chartering, including six in 1937 as "too remote" though within the period considered. Of these, some 19 or 20, relating to chartering to other carriers subject to regulation, seem justified. But with them eliminated, 23 instances of chartering to shippers who were not carriers remain to support the claim. We are unable to accept the view that they constituted so meager a showing as to justify on this ground withholding a permit for chartering.

In the *Moran* case the Commission said:

"We think it unnecessary in this case to determine whether the services performed were or were not actually subject to the act. The nature of the cargo in the vessels towed is usually the determining factor as to whether or not the service is exempt, but applicant's towage service is performed without regard to the nature of the cargo loaded in the vessels towed by it." 260 I. C. C. 269, 272.

In the *Russell Bros.* case the Commission stated, with reference to the definition of a common carrier by water in Part III and the "grandfather" requirement of bona fide operation on the critical date:

"It will be noted that in neither instance is there any reference to whether the transportation performed by the carrier is or is not subject to regulation. In determining a carrier's status and the scope of its operations during the 'grandfather' period, its entire operation should be considered, and not merely that part which the Congress has seen fit to make subject to regulation. To find that 'grandfather' rights may be granted only to the extent that a showing is made as to the performance of regulated transportation requires the reading into the law of language which, in fact, is not there." 250 I. C. C. 429, 433–434.[9]

---

[9] The opinion continued: "This matter is particularly important in instances like the present where an applicant is seeking a certificate covering all commodities, or general cargo. Obviously no carrier actually transports all commodities, and therefore the bona fides of an applicant's operations depend on the representative character of

Notwithstanding the Commission's insistence that these cases are distinguishable, as resting upon different showings, it is difficult to accept that view if, as the *Moran* opinion indicates, the crucial fact to be shown is performance of service "without regard to the nature of the cargo loaded in the vessels towed by it." The conclusion is even more difficult if, as the *Russell Bros.* opinion states, "To find that 'grandfather' rights may be granted only to the extent that a showing is made as to the performance of regulated transportation requires the reading into the law of language which, in fact, is not there."

This statement applies equally to the comparable statutory provisions relating to contract carriers. Cf. *C. F. Harms Co., Contract Carrier Application,* 250 I. C. C. 685; 260 I. C. C. 171. Section 309 (f) does not in terms require that such a carrier, to be entitled to "grandfather" rights, must have been engaged in the transportation of commodities which are nonexempt. It may be conceded that such a limitation properly may be implied from the requirement of substantial parity between operations on the critical date and those for which a permit is sought, as to other forms of transportation than the furnishing of vessels as defined in § 302 (e). Cf. *Alton R. Co.* v. *United States,* 315 U. S. 15, 22; *Noble* v. *United States,* 319 U. S. 88, 92. But it does not follow that the same limitation applies to "the furnishing for compensation (under a charter, lease, or other agreement) of a vessel" under

---

the transportation performed. It may well be that the carrier holds itself out to, and actually does, transport all traffic offered to it from and to all points covered by its application but that the great bulk of such transportation is exempt from regulation. It seems clear that if we shut our eyes to all of applicant's transportation except that which is subject to regulation, we get an incomplete and distorted picture of the nature and extent of its operations. To place limitations upon 'grandfather' rights predicated upon that view would be unjust and unreasonable, and is not contemplated by the law." 250 I. C. C. 429, 434.

that section. It defines the act of furnishing, to shippers other than regulated carriers, as "engaging in transportation" within the meaning of "contract carrier by water" as that term is used in the section. If the purpose was to treat this form of water operation identically with others covered by the general definition, the purpose and utility of the special provision concerning furnishing become obscure if the provision does not in fact become wholly ineffective.

The chartering or leasing of vessels and equipment is not so obviously similiar to or identical with actively "engaging in transportation" that, without specific provision for coverage, it necessarily would be included within that of the more general definitions and provisions. Quite different modes of operation, physically and in business management, as well as responsibilities, conceivably if not also generally, give the activity materially different characteristics from the carrying of goods in the more conventional sense. Congress obviously sought to bring these operations within the regulatory scheme by the special provisions.

In doing so we do not think it had in mind the purpose to draw a sharp line between furnishers of vessels carrying only exempt commodities and those carrying nonexempt ones. That is true, notwithstanding the fact that one engaging in chartering affecting only the former is no more required to secure a permit than one engaging in other forms of transporting exempt commodities.

The legislative history shows that the original counterpart of the "furnishing" provision of § 302 (e) extended to the furnishing of a vessel "to another person" rather than "to a person other than a carrier subject to this Act" as it now stands. This met with vigorous opposition, on the ground that an owner supplying equipment to another carrier would become subject to the Act, thus possibly imposing upon him responsibility for the charges of the

lessee, or other person performing the operation, for performing it and for those operations, over which of course the owner would not have control. It was feared this might destroy a large amount of chartering activity, including both intercoastal and inland waterway business, conducted then with a high degree of flexibility. Cf. 84 Cong. Rec. 9709; *id.*, 9979. Emphasis was placed in the discussion upon the freedom of railroads, acting under Part I, and of motor carriers, under Part II, to lease surplus equipment without becoming responsible as regulated carriers for its use; and upon the common practice of barge lines and other water carriers to lease equipment freely and for long or short periods of time on open markets. *Ibid.*

To meet the objections an amendment was offered in the House to make the original proposal read: ". . . a person which . . . furnishes a vessel . . . shall itself *not* be considered to be engaged. . . ." 84 Cong. Rec. 9979. Had this finally been adopted, chartering would have been wholly exempt. The final form of the bill struck out the word "not" and substituted the present provision. The Conference Report states, in addition to the purpose to limit application to cases where the vessel is furnished to a person other than a regulated carrier, the intention to clarify the language "to make sure that the person furnishing the vessel will not, *simply by reason of furnishing the vessel,* become a contract carrier subject to part III of the act *as to that part of its business not related to the furnishing and use of the vessel.*"[10] (Emphasis added.)

This seems obviously to contemplate that chartering, or the defined furnishing of equipment, is to be regarded and treated as in a separate category from other forms of engaging in regulated activity; and that the one furnish-

---

[10] H. R. No. 2016, 76th Cong., 3d Sess., 77.

ing the vessel by that act would become a "contract carrier subject to part III" as to that part of the business, unless the vessel were furnished to another carrier. This conclusion is further supported by the fact that § 302 (e) in terms takes account of the character of the property to be so transported in the language "to be used by the person to whom such vessel is furnished in the transportation of its own property."

This limitation takes no account of the distinction between exempt and nonexempt commodities. Had Congress intended that line to be drawn rigidly to require showing of chartering for carriage of nonexempt goods, in order to establish grandfather rights, that purpose, we think, would have been clearly expressed. Its concern in this provision was not with that line. The obvious purpose was to secure full regulation of the traffic, by application of the Act's provisions to the lessee, if he should be a regulated carrier, thus exempting the lessor in that situation; otherwise to the lessor.

In providing for the alternative incidence of coverage, Congress recognized that, in chartering, the character of the commodity, as being exempt or not exempt, was more the concern of the "lessee" than of the lessor or charterer. The latter's concern was with the furnishing of the vessel as such and with whether the "lessee" was a regulated carrier. To regard the Act as imposing the further limitation that the lessor also must have regard to the character of the cargo would cast that activity, intended to be kept flexible, as the legislative history shows, into a more rigid regulatory mold than other forms of transportation covered either by Part III or by Parts I and II.

Accordingly we think the Commission erred in concluding that appellant was not engaged in chartering operations subject to Part III on the critical date, for failure to show "the nature of the services rendered, the commodities carried in, or the points served with such vessels." This

conclusion, moreover, seems to be in accord with its own decision in the *Harms* case and in harmony with the principles followed in the *Moran Towing* case and that of *Russell Bros.*[11]

The Commission urges however that we are not concerned simply with inconsistencies in its decisions, since evidence varies with cases and to its informed judgment is confided the primary duty to make appropriate applications of the Act. We respect that judgment and that obligation. But the matter now involved goes beyond mere apparent inconsistency in the statute's application. Seemingly there has been a basic difference of opinion within the Commission itself concerning the necessity for proof showing the character of the commodity, as exempt or nonexempt, to establish grandfather rights to chartering operations and also as to the character of the proof required. This appears from the fact that two of the three Commissioners who participated in the decision by Division IV in this case dissented from the full Commission's decision in the *Harms* case and one of them in the *Moran* case.

With full respect for the dissenting judgment, we think the view eventually reached by the majority in those decisions accords with the statutory purpose and provision.[12] The dissenting Commissioners emphasize the requirement

---

[11] See, however, *W-764, Upper Mississippi Towing Corp., Common Carrier Applications*, 260 I. C. C. 292.

[12] It is suggested, by the protesting intervenors, that appellant has failed to exhaust its administrative remedy by neglecting to apply a second time for reconsideration by the Commission after the final *Harms* decision, cf. note 8, although it was rendered after the complaint was filed in this case. The suggestion, if followed generally, conceivably could result in keeping applicants running back and forth between court and commission, if not interminably, then to an extent certainly not contemplated by the exhaustion doctrine. Appellant fulfilled the requirements of that doctrine by its application for reconsideration made to the entire Commission and its denial of the petition.

of § 309 (g) that a permit shall specify the business of the contract carrier and the scope thereof; and regard this as qualifying the "furnishing" provision of § 302 (e) so as to require substantially the same specific showing as to character of the commodities and territorial scope of operations in chartering as has been deemed required for other forms of transportation. Without this, they say, the substantial parity between future operations and prior bona fide operations contemplated by the grandfather provisions cannot be maintained.

The policy of maintaining that parity by adequate standards of proof is sound, although "the Act is remedial and to be construed liberally." *McDonald* v. *Thompson,* 305 U. S. 263, 266; *Crescent Express Lines* v. *United States,* 320 U. S. 401, 409. The policy, however, may be defeated by too strict an application in particular cases, more especially it would seem in relation to water carriers whose operations, in contract carriage at any rate, are more generally irregular and spasmodic than in the case of other carriers. The Court has said, even in relation to the latter: "The Commission may not atomize his prior service, product by product, so as to restrict the scope of his operations, where there is substantial evidence in addition to his holding out that he was in *'bona fide* operation' as a 'common carrier' of a large group of commodities or of a whole class or classes of property. There might be substantial evidence of such an undertaking though the evidence as to any one article was not substantial." *United States* v. *Carolina Carriers Corp.,* 315 U. S. 475, 483, 484.

This language has particularly appropriate application to the proof made in this case, at any rate in relation to the chartering operations, in so far as proof may be required for compliance with the requirements of § 309 (g). Beyond this, it bears also upon the extent to which those requirements are to be taken as qualifying § 302 (e). To

consider them as doing so in a manner to require the chartering carrier to prove specific instances of nonexempt commodity carriage would molecularize, if not atomize, the chartering business and threaten, if not accomplish, the destruction anticipated in the congressional debates. That result, or one tending strongly toward it, as would such a construction, hardly can be taken to be consistent with the declared national transportation policy "to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each" or the further declaration that this policy is to be applied in enforcing *all* of the Act's provisions.[13] Spasmodic operation hardly would be regarded as an inherent advantage of rail or perhaps of motor service in general. It is, or may be, the most valuable inherent advantage of a contract water carrier.

It follows that the judgment must be reversed as to the chartering phase of appellant's operations.

In view of what has been said, particularly with reference to the varied and spasmodic character of appellant's operations, and the policy of maintaining these as an inherent advantage of water transportation, our judgment might differ from the Commission's as to the sufficiency of the showing made as it related to other operations than chartering and, in view of that showing, as to the necessity or propriety of limiting the period of operations considered, in relation to the claim of grandfather rights, to that following January 1, 1936.

Nevertheless, our views in these respects are not to be substituted for the Commission's which is not only specially informed but broadly discretionary and controlling except in case of clear departure from statutory requirements. Apart from the chartering, we are unable to say

---

[13] Cf. Oppenheim, The National Transportation Policy and Inter-Carrier Competitive Rates (1945) 27 ff.

there was such a departure in this case. The policy of the Commission has recognized that a somewhat more liberal attitude is required in the case of water carriers than with respect to others in the length of the period to be considered as establishing the claim of bona fide operation.[14] Moreover, as has been stated, the evidence relating to the latter part of the period prior to 1936 was rather more vague than that affecting both earlier and later periods. In view of these facts we cannot say that the Commission erred in its findings or conclusion that appellant was not entitled, on the showing made, to a permit for grandfather operations other than those involving chartering.

In this phase of the case it is necessary only to add that, in view of the specific statement contained in the Conference Report quoted above,[15] appellant is not entitled to found grandfather rights to transportation other than chartering upon a showing only of chartering operations.

We think too that it would be an invasion of the province of the Commission for us to interfere with its action in finding that appellant upon the showing it made was not, at the time of the application, entitled to a permit for a new operation. It is true that its confinement, since about 1940, to operations substantially, if not exclusively, in transportation of petroleum products has been induced, according to the proof, by the war emergency, and that this business in all probability will terminate with the emergency's end. It is likewise true that appellant's equipment can be converted readily for other uses when

---

[14] Compare *Moran Towing & Transp. Co., Applications*, 260 I. C. C. 269, 273; *Thames River Line, Common Carrier Application*, 250 I. C. C. 245; and other cases in the latter volume at pp. 106, 117, 179, 353, 370 and 599, with, e. g., *Jack Cole Co.* v. *United States*, 41 M. C. C. 657, 59 F. Supp. 10, affirmed per curiam, 324 U. S. 822; *Gregg Cartage Co.* v. *United States*, 316 U. S. 74.

[15] Cf. text at note 10.

that occurs and, unless authority is obtained to conduct operations upon a scale sufficient to enable appellant to employ it profitably, the business may be forced to close or required to operate uneconomically. Nevertheless, in view of the failure to make specific showing of some immediate prospect of entering upon new and nonexempt operations, and of the range and weight of the Commission's discretion in relation to such applications, we are not at liberty to interfere with its action.

The Commission has suggested, in the brief, that upon another application, accompanied by a sufficient showing of intended "new operations," the desired permit may be granted. No doubt, in such an event, the application will be considered in the light of the Act's injunction of "fair and impartial regulation . . . so administered as to recognize and preserve the inherent advantages" of the type of transportation in which the Barrett Line has been engaged through four generations of river life.

The judgment is affirmed as to operations other than chartering; as to them, it is reversed, and the cause is remanded for further proceedings in conformity with this opinion.

The CHIEF JUSTICE, MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, and MR. JUSTICE JACKSON, dissenting.

The Court, in rejecting the refusal of the Interstate Commerce Commission to grant a permit as a contract carrier by water for charter purposes, is greatly influenced by an alleged conflict in the Commission's determinations. Compare *C. F. Harms Co., Contract Carrier Application,* 260 I. C. C. 171; *Russell Bros. Towing Co., Common Carrier Application,* 250 I. C. C. 429; *Moran Towing & Transportation Co., Applications,* 260 I. C. C. 269, with *Upper Mississippi Towing Corp., Common Carrier Applications,* 260 I. C. C. 292. Assuming such a conflict, it is our business to deal with the case now here and not

to be concerned with apparent inconsistencies in administrative determinations. If the Commission has kept within the bounds of the statute in this case, its order should be sustained. We think that the interpretation of § 302 (e) made by the Commission was proper. Certainly, the construction of this provision involves considerations so bound up with the technical subject matter that, even though the neutral language of the statute permits, as a matter of English, the construction which the Court now makes, the experience of the Commission should prevail. Compare *Gray* v. *Powell,* 314 U. S. 402.