**M. & M. TRANSPORTATION COMPANY**
and Stone's Express, Inc., Plaintiffs,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 54–353–M.

United States District Court,
D. Massachusetts.

Jan. 14, 1955.

Herbert Burstein, New York City, for plaintiffs.

James E. Kilday, John H. D. Wigger, Washington, D. C., Stanley N. Barnes, Asst. Atty. Gen., Anthony Julian, U. S. Atty., Boston, Mass., for the United States.

Edward M. Reidy, Chief Counsel, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Before MAGRUDER, Circuit Judge, and McCARTHY and ALDRICH, District Judges.

MAGRUDER, Circuit Judge.

This action was brought by two motor common carriers pursuant to 28 U.S.C. §§ 1336, 2321–2325 to set aside and enjoin enforcement of orders of the Interstate Commerce Commission authorizing the acquisition by St. Johnsbury Trucking Company, Inc., of St. Johnsbury, Vermont, of a portion of the operating rights of Hinsch Transportation Co., Inc., of New York, N. Y., and further authorizing acquisition of control

of these operating rights by certain individuals, shareholders of St. Johnsbury.[1] The effective date of the Commission's orders authorizing the acquisition has been extended to 30 days after final judgment in the instant proceeding.

Briefly, prior to the acquisition St. Johnsbury was authorized by certificate No. MC–108473 to transport general commodities, with certain exceptions, over regular routes between Boston and Springfield, Mass., and a variety of points in Massachusetts, Vermont, New Hampshire, and Maine, and over irregular routes between points in Vermont and points in Rhode Island, Massachusetts, Connecticut, and New York. Under its certificate, No. MC–55888, Hinsch was authorized to operate as a motor common carrier of general commodities, with certain exceptions, over regular routes between the New York metropolitan area and Boston and Springfield, Mass., serving a variety of intermediate points.

On November 27, 1951, St. Johnsbury and Hinsch jointly applied for the Commission's approval of the acquisition of Hinsch's rights by St. Johnsbury for $75,000. The statutory provisions relevant to this acquisition are § 5(2) (a), (b), (c) and (e) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2) (a), (b), (c) and (e).

On December 18, 1951, the Commission granted St. Johnsbury temporary authority under 49 U.S.C.A. § 310a(b) to operate under the Hinsch rights for a period of 180 days. This temporary authority was later extended, and in a proceeding before this court the extension was held to have been without authority and was enjoined. Stone's Express, Inc., v. United States, D. C., 1954, 122 F.Supp. 955. This injunction has been stayed pending appeal by the Commission to the Supreme Court. St. Johnsbury is presently serving Hinsch

1. Harry D. Zabarsky et al.—Control; St. Johnsbury Trucking Company, Inc.— Purchase—Hinsch Transportation Co., Inc., 60 M.C.C. 129 (1954), modifying 59 M.C.C. 747 (1954), reversing 59 M.C.C. 419 (1953).

points under this temporary authority and did so during the period when its application for permanent acquisition was being processed before the Commission.

An extended hearing on the application for permanent acquisition was held before a trial examiner at which many competing carriers throughout the New York to Maine area appeared to protest the proposed acquisition. The examiner recommended that approval not be given to acquisition of the major portion of the Hinsch rights, under which he found Hinsch had conducted almost no operations and which, if granted, would permit St. Johnsbury to perform a new and entirely different service in a territory now adequately served by existing carriers. The examiner recommended approval of acquisition of Hinsch rights between the New York metropolitan area and points in Maine, via Boston. As to this service, the examiner found that it would serve the needs of shippers, that it had not been sufficiently established by the protestants that St. Johnsbury's entry into this area would substantially impair the financial position of existing carriers, and that Hinsch had interchanged some shipments with other carriers for delivery to points in Maine.

Upon review by Division 4 of the Commission, at which both the applicant and the protestant carriers filed exceptions to the examiner's proposed report, it was held that the acquisition of any of the Hinsch rights by St. Johnsbury would not be consistent with the public interest and therefore should be denied. The Division accepted the examiner's conclusions as to the major portion of the rights, but found that, as to the limited New York to Maine authority, the evidence of shipper convenience did not establish a need for such service, the service would bear little resemblance to that which Hinsch formerly rendered alone or by interchange, the purchase price would have little justification based on Hinsch's past operations, it did not appear that the limited operation would be economically practicable, and entry of St. Johnsbury might jeopardize existing carriers, many of which already suffered high operating ratios (i. e., ratios of current expense to current income).

Upon reconsideration by the full Commission, the decision by Division 4 was reversed and the acquisition found to be authorized by the Act. Certain relatively minor exclusions were made in the rights to be acquired. By a later order, the Commission excluded operations by St. Johnsbury between northern New England and certain intermediate Hinsch points in Connecticut and Rhode Island, finding that Hinsch had rendered little or no service to these points.

Petitioners have in their complaint assailed the order of the Commission on a number of grounds, but principally petitioners argue that the Commissioner's "basic" findings underlying the "ultimate" statutory findings are inadequate to support the ultimate findings and that such basic findings as the Commission did make are not supported by substantial evidence on the whole record.

■ The courts have continually asserted that the discretion of the Commission in a § 5 proceeding is sweeping, Congress intending that the Commission exercise its expert knowledge in assuring consistency with the public interest, and the exercise of this discretion will not be disturbed if the Commission's findings are adequate in view of the statutory requirements. See, e. g., McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 86–88, 64 S.Ct. 370, 88 L.Ed. 544; Herrin Transp. Co. v. United States, D.C.E.D.La.1952, 108 F.Supp. 89, 93–95, affirmed Per Curiam 1953, 344 U.S. 925, 73 S.Ct. 497, 97 L.Ed. 712; cf. United States v. Pierce Auto Freight Lines, Inc., 1946, 327 U.S. 515, 530–533, 535–536, 66 S.Ct. 687, 90 L.Ed. 821. But it is not enough that the Commission find, as it did find, the ultimate facts required by § 5 (i. e., that "the

proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest," that the terms and conditions of acquisition are "just and reasonable",[2] and that the transaction will not "result in an increase of total fixed charges, except upon a specific finding by the Commission that such increase would not be contrary to public interest"). On review, an order should be set aside if it does not contain the "basic" or "essential" or "quasi-jurisdictional" findings necessary to support its conclusions. E. g., State of Florida v. United States, 1931, 282 U.S. 194, 208–209, 212–215, 51 S.Ct. 119, 75 L.Ed. 291; United States v. Chicago, M., St. P. & Pac. R. Co., 1935, 294 U.S. 499, 504–505, 510–511, 55 S.Ct. 462, 79 L.Ed. 1023; United States v. Pierce Auto Freight Lines, Inc., supra, 327 U.S. at 533, 66 S.Ct. at page 696; Secretary of Agriculture v. United States, 1954, 347 U.S. 645, 652–654, 74 S.Ct. 826, 98 L.Ed. 1015. Compare Beaumont, S. L. & W. Ry. Co. v. United States, 1930, 282 U.S. 74, 86–87, 51 S.Ct. 1, 75 L.Ed. 221. See our reference to this matter in New York Central R. Co. v. United States, D.C.1951, 99 F.Supp. 394, 400–401.

■ The nature of the required basic findings is in part stated, in part suggested, by the statute. Section 5(2) (c) prescribes that the Commission should give weight to, among other considerations, "(1) The effect of the proposed transaction upon adequate transportation service to the public; * * * (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." And by requiring ultimate findings of "public advantage" or "public convenience and necessity" to support similar transactions, Congress by implication has indicated that these findings need not be made in an acquisition proceeding involving only motor carriers.[3] The Supreme Court has several times mentioned other factors which should be reflected in the Commission's basic findings in a § 5 proceeding. New York Central Securities Corp. v. United States, 1932, 287 U.S. 12, 23, 25, 53 S.Ct. 45, 47, 48, 77 L.Ed. 138 ("economy and efficiency in operation"; "adequacy of transportation service"); McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 86–88, 64 S.Ct. 370, 88 L.Ed. 544 (improving adequacy of service, but Commission need not find that existing service is inadequate; Commission should consider diminution of competition).

Here the Commission made extensive basic findings which clearly meet the requirements established under the statute. With regard to the promotion of efficient operations by the acquisition, it found that although St. Johnsbury's interchange with other carriers of full truckloads had, with some delays, been generally satisfactory, interchange of less than truckloads had not been satisfactory and attempts made by St. Johnsbury to remedy this situation had not succeeded; that Hinsch's preponderance of north-bound traffic and St. Johnsbury's preponderance of south-bound traffic, if unified, were expected to afford a balanced operation and pro-

2. The precise statutory language is, "If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable * * * it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable * * *."

3. Section 5(2) (b) provides that if a railroad is an applicant for acquisition of a motor carrier, the Commission must find not only consistency with the public interest but also that the acquisition will enable the railroad "to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." Where application is made for a new motor carrier certificate, the Commission must find the applicant "fit, willing, and able" and that the proposed service "is or will be required by the present or future public convenience and necessity * * *." Section 207, 49 U.S. C.A. § 307.

vide a unified service, operating more efficiently, eliminating facility duplication, without materially increasing operating costs; that St. Johnsbury's earnings were greater on shipments between Vermont and the New York metropolitan area via Springfield or Albany, which would be permitted under the Hinsch license, than via Boston, its only gateway for present regular service; and that St. Johnsbury was financially more sound and a more efficient operator than Hinsch. As to the scope of the Hinsch operations, the Commission found that Hinsch operated primarily between New York City and Boston but participated in shipments to and from points in Massachusetts, Connecticut, Rhode Island, and the New York metropolitan area; that Hinsch operated on a scale commensurate with its resources and facilities; and that Hinsch interchanged some shipments both at New York City and Boston and at intermediate points. With regard to the desires of shippers in the area in question, the Commission found that, if the acquisition were approved, St. Johnsbury would institute overnight through service between New England and the New York metropolitan area in response to the requests of shippers; and that shippers' testimony was generally that they would continue to utilize St. Johnsbury's through single-line service if the acquisition were approved. With regard to the reasonableness of the purchase price for the Hinsch rights, the Commission found that Hinsch had continually conducted some operations within its authority, from which it derived annual gross operating revenues in excess of $200,000; that this amount of traffic was of some going-concern value; that had the operations been unified in 1951 St. Johnsbury's net income for that year would have increased an amount estimated to be approximately 10 per cent of the purchase price; and that the purchase price did not appear to be excessive, and payment should not prove improvident or unduly burdensome. With regard to the effect of the acquisition

upon competing carriers, the Commission found that the probability that St. Johnsbury, as a more aggressive carrier, would become a more substantial competitor by providing single-line service in lieu of interline service, did not necessarily preclude approval; that most of the protestant carriers had increased operating revenues and net income since 1948, and it did not appear that they had lost or would lose sufficient traffic to affect their operations materially; and that the available traffic was ample to support continuation of a part of Hinsch's operations, as unified with St. Johnsbury, as well as the operations of competing carriers.

Petitioners contend the findings are inadequate essentially because there is no finding (1) that a public need existed for the unified service, (2) that the existing service was inadequate, and (3) that a new service was not created by the acquisition. They claim that prior Commission decisions which they maintain require these findings (1) are entitled to weight in interpreting the ambiguous ultimate requirement of consistency with the public interest, and (2) must be adhered to by the Commission or specifically announced as abandoned. These contentions are without merit for several reasons: First, the Commission findings, although not made in the precise language urged, largely meet the petitioners' objections. Second, it is not entirely manifest that the Commission in the instant case departed from carefully enunciated prior principles. Petitioners rely to a great extent on Pacific Intermountain Express Co.—Control and Purchase—Keeshin Freight Lines, Inc., 57 M.C.C. 341 (1950). There the proposed acquisition was opposed not only by competing motor carriers but by the transcontinental railroad systems and certain grain interests. The Commission found that aggressive competition by the applicant on a transcontinental basis might seriously impair the economic operation of the railroads and result in higher rates, not only with respect to carriage of commodities which

the motor carriers might solicit, but also as to commodities which must necessarily be transported by rail. It is true that the order also stated as additional reasons for denial that motor competitors might suffer adversely, that since the applicant had interchanged little traffic acquisition would result in a new service, and that the resulting service would serve no proved public need. There is also a statement to the effect that the standards adopted in an application for new operating authority under § 207 should be applied in a § 5 proceeding to require denial of a proposed acquisition where no public need is shown, a new service would result, and existing carriers seem able to perform adequate service. However, on rehearing (57 M.C.C. 467 (1951)) some of this language was withdrawn, and in its report on reconsideration in J. W. Ringsby—Control; Ringsby Truck Lines, Inc.—Control—Northern Transportation Co., 58 M.C.C. 594 (1952), the Commission further limited the application of the Pacific Intermountain Express decision. Third, even if the latter case had not been limited by later decisions, the asserted inconsistency between the instant result and that in the Pacific Intermountain Express case would not require setting aside the Commission order. The courts have many times held that the findings of the Commission may not be attacked because they are inconsistent with findings made in other cases. E. g., Georgia Public Service Commission v. United States, 1931, 283 U.S. 765, 775, 51 S.Ct. 619, 75 L.Ed. 1397; Virginian Ry. Co. v. United States, 1926, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463; Western Paper Makers' Chemical Co. v. United States, 1926, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941. Cf. Federal Communications Commission v. WOKO, Inc., 1946, 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204. Petitioners cite Secretary of Agriculture v. United States, 1954, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015, for the proposition that the Commission must explain a departure from prior decisional principles. In this case an order was vacated primarily because of the inadequacy of the Commission's findings to explain the legal basis of its decision. The Court was unable to tell from the order what the Commission meant, and when the Court looked at prior decisions of the Commission it found them inconsistent with the result reached. While the Court did say, 347 U.S. at page 653, 74 S.Ct. at page 831, that "the Commission has not adequately explained its departure from prior norms", this became important only because the findings given were inadequate. Thus it would appear that, had the basic findings of the order been adequate, the Court would not have reached the question whether the Commission had without explanation departed from prior decisional norms. See Barrett Line, Inc., v. United States, 1945, 326 U.S. 179, 201–202, 65 S.Ct. 1504, 89 L.Ed. 2128. In the same way this court, in New York Central R. Co. v. United States, D.C.1951, 99 F.Supp. 394, looked to prior Commission decisions not to require an explanation of inconsistency but in an attempt to understand the basis of the decision where the findings were either unclear or not made. Where, as in the instant case, the findings are on their face adequate and explain the basis for decision, there is no occasion to examine consistency with prior decisions. Fourth, while the inconsistency of prior Commission decisions might stimulate judicial examination of the Commission's interpretation of a statute, see Barrett Line, Inc., v. United States, supra, 326 U.S. at pages 190–193, 196–198, 65 S.Ct. at pages 1509–1511, 1512–1513, it is not possible here to hold that the statute's "consistent with the public interest" requires the basic findings urged by petitioners.[4]

---

4. The distinction between § 5's "consistent with the public interest" and § 207's "public convenience and necessity" disposes of the contention as to a finding of public need. And even within § 5, it is evident that Congress intended a distinction be-

A reviewing court's inquiry as to the evidentiary support for Commission findings is limited to determining whether there is substantial evidence for the findings on the whole record or such portions as may be cited by a party. 5 U.S.C.A. § 1009(e), § 10 (e) of the Administrative Procedure Act. We assume, without deciding, that this is a case "reviewed on the record of an agency hearing provided by statute". See Herrin Transp. Co. v. United States, D.C.E.D.La.1952, 108 F.Supp. 89, 94, affirmed Per Curiam 1953, 344 U.S. 925, 73 S.Ct. 497, 97 L.Ed. 712. Petitioners attack substantially all the Commission findings on this ground. Although the record contains some conflicting evidence, all the important basic findings made by the Commission are supported by substantial evidence on the whole record. One finding appears to be without substantial support, but we have not the slightest reason to infer that without this finding the Commission's ultimate conclusion would have been any different. Even without this one questionable finding we would uphold the order of the Commission. It would be judicial administration amounting to nothing more than "marching the king's men up the hill and then marching them down again",[5] to set aside the order of the Commission for this reason. See Bethlehem Shipbuilding Corp., Ltd. v. National Labor Relations Board, 1 Cir., 1940, 114 F.2d 930, 935, quoting N. L. R. B. v. Newport News Shipbuilding & Dry Dock Co., 1939, 308 U.S. 241, 247, 60 S.Ct. 203, 84 L.Ed. 219.

A judgment will be entered dismissing the complaint.

ALDRICH, District Judge (concurring).

I am willing to concur, albeit reluctantly, that the complaint should be dismissed. This hesitation is due to the fact that I find it a little difficult to assume as readily as does the majority that there is "not the slightest reason to infer that without [one] finding," which the court finds to be without substantial support, the Commission's ultimate conclusion would have been any different. Basically the Commission made few findings of the sort required to support its order. The finding which I understand the majority concedes to be unwarranted in the relatively brief supportative part of the Commission's opinion appears twice. It is with reluctance that I conclude that without it the ultimate decision would have been the same. Indeed, were it not for the heavy burden on the plaintiffs I would reach the opposite result.

What troubles me more seriously are certain observations in the majority opinion dealing with the meaning and interpretation of § 5's "consistent with the public interest."

The Transportation Act of 1920 was a relatively simple affair. The act has grown into its present comprehensive and complex condition sporadically. The almost inevitable result is that an entirely uniform meaning and purpose, if it still exists, is hard to discover. This seems particularly so with respect to the elusive phrase "consistent with the public interest."

As I read its opinion, the majority is at least receptive to the idea that "consistent with the public interest" as used in § 5 is to be equated with the

tween "public interest" and "public advantage". Petitioners' argument that the Commission must find the existing service inadequate in a § 5 proceeding has been rejected by the Supreme Court. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 86–87, 64 S.Ct. 370, 88 L. Ed. 544. Lastly, it would not seem that the creation of a new service would be inconsistent with the public interest—on the contrary, it might greatly benefit the public. If petitioners' argument were to prevail, acquisitions would be limited to those involving non-contiguous carriers, or carriers which substantially interchanged all through traffic with one another.

5. City of Yonkers v. United States, 1944, 320 U.S. 685, 694, 64 S.Ct. 327, 332, 88 L.Ed. 400.

phrase "not inconsistent with the public interest"—in other words, that it is a mere neutral status. While this is not an impossible result, both the history of the act and such principles of uniformity of construction as it now permits lead me to the opposite conclusion.

Before the Commission under the Transportation Act of 1920 could approve joint ownership or control there had to be a finding that it "will be in the public interest," or that the "public interest will be promoted." Ch. 91, § 407, 41 Stat. 481. In the subsequent amplification and reenactment of these provisions these phrases were displaced with "will be consistent with the public interest," "to public advantage," "would not be contrary to public interest." 49 U.S.C.A. § 5(2) (b) and (e). The extent that this introduced new meanings is the question. Although the wording was changed, I believe that fundamentally the same result was intended. Not that "consistent with the public interest" means "public convenience and necessity", or even, as contended by plaintiffs here, "public need," but that it at least means something positive. In other words, I think "consistent with" means "*in* the public interest," and something more than the mere negative "not inconsistent." The phrase used once, "public advantage," which the majority distinguishes, I believe is a grammatical, and not a semantic difference.

No purpose will be served by my laboring this matter, except to note that all that is required for the Commission to approve a complete merger under § 5(2) is that it be consistent with the public interest, whereas mere joint agreements under § 5(1) require a showing of better service to the public, or of economy in operation, and that they will not unduly restrain competition. Consequently a neutral interpretation of § 5(2) would seem to make a complete merger more easily endorsable than a joint agreement. I would not care to uphold decisions under § 5(2) that have only neutral findings to support them.