**NEW YORK CENT. R. CO. et al. v.
UNITED STATES et al.**

Civ. A. No. 51–65.

United States District Court
D. Massachusetts.

July 30; 1951.

R. J. Fletcher, Washington, D. C., and Kenneth F. Stone, New York City (Neal J. Holland, Boston, Mass., Francis L. Brown, B. J. Viviano, New York City, and John F. Reilly, Washington, D. C., on the brief), for plaintiffs.

Walter D. Matson, Attorney, Office of the Solicitor, United States Department of Agriculture, Washington, D. C., and William D. McFarlane, Sp. Asst. to Atty. Gen. (H. G. Morison, Asst. Atty. Gen., James E. Kilday and John F. Baecher, Sp. Assts. to Atty. Gen., George F. Garrity, U. S. Atty., Boston, Mass., and Charles W. Bucy, Associate Solicitor, United States Department of Agriculture, Washington, D. C., on the brief), for the Secretary of Agriculture, intervening plaintiff, and United States of America, defendant.

B. A. Brickley, Boston, Mass. (Timothy J. Murphy, Asst. Atty. Gen., Commonwealth of Massachusetts, William L. Baxter, Corp. Counsel, and Ashelen P. Senopoulos, Asst. Corp. Counsel, City of Boston, Oliver R. Waite, and Brickley, Sears & Cole, all of Boston, Mass., on the brief), for Port of Boston Authority, Maritime Association of Boston Chamber of Commerce, Inc., Boston Grain & Flour Exchange, Foreign Commerce Club of Boston, Inc., and City of Boston, intervening plaintiffs.

Wilbur La Roe, Jr., Washington, D. C. (Henry E. Foley, Foley, Hoag & Eliot, all of Boston, Mass., Leander I. Shelley, General Counsel, Port of New York Authority, New York City, Frederick E. Brown, Arthur L. Winn, Jr., and Samuel H. Moerman, all of Washington, D. C., on the brief), for Port of New York Authority, intervening plaintiff.

Edward M. Reidy, Associate Chief Counsel, Washington, D. C. (Daniel W. Knowlton, Chief Counsel, Washington, D. C., on the brief), for Interstate Commerce Commission, defendant.

Harry C. Ames, Washington, D. C. (Sumner Babcock, Boston, Mass., and James B. Doak, Philadelphia, Pa., on the brief), for Chamber of Commerce of Philadelphia and Commercial Exchange of Philadelphia, intervening defendants.

Paul V. Miller, Philadelphia, Pa. (Anthony P. Donadio, Lockwood W. Fogg, Jr., Philadelphia, Pa., W. Harvey Small, Baltimore, Md., and Choate, Hall & Stewart, Boston, Mass., on the brief), for Baltimore & O. R. Co., Reading Co., Pennsylvania R. Co., and Western Maryland Ry. Co., intervening defendants.

Karl J. Grimm, Baltimore, Md., for Baltimore Ass'n of Commerce and Baltimore Chamber of Commerce, intervening defendants.

Alfred G. Malagodi, Asst. U. S. Atty., Boston, Mass., for U. S.

Foley, Hoag & Eliot and Herbert L. Berman, all of Boston, Mass., for Port of New York Authority; also Wilbur La Roe, Jr., Washington, D.C., for same Intervenor.

Thomas N. Biddison, Baltimore, Md., City Sol., and Daniel B. Leonard, Asst. City Sol., for Maryland City Council of Baltimore.

Bailey Aldrich, Choate, Hall & Stewart, all of Boston, Mass., for Pennsylvania R. Co., Baltimore & O. R. Co., Reading Co., Western Maryland Ry. Co., intervenors.

Before MAGRUDER, Circuit Judge, and SWEENEY and FORD, District Judges.

MAGRUDER, Circuit Judge.

This action was brought by the New York Central, Boston and Maine, Delaware, Lackawanna and Western, and Lehigh Valley railroads, pursuant to 28 U.S.C. §§ 1336, 2321–2325, to set aside and enjoin enforcement of an order of the Interstate Commerce Commission cancelling certain new rate schedules proposed by the plaintiff railroads. Investigation and Suspension Docket No. 5641, Export Grain from Buffalo to New York, 278 I.C.C. 31(1950). The United States in its answer admitted all the allegations of the complaint and prayed that the relief requested be granted, and the Secretary of Agriculture and various commercial and port interests in Boston and New York intervened on behalf of plaintiffs. The action has been defended by the Commission, intervening commercial and port interests in Philadelphia and Baltimore, and the Baltimore and Ohio, Pennsylvania, Reading, and Western Maryland railroads.

In the schedules filed to become effective April 11, 1949, plaintiffs proposed to reduce by 0.5 cent per hundred pounds the export rates on ex-lake grain (grain having had a prior movement on the Great Lakes) from Buffalo and Oswego, N. Y., to Albany, N. Y., Boston, Mass., New York, N. Y., and Portland, Maine, and from Ogdensburg, N. Y., to Boston; to increase from ten days to twenty days the period of free storage time on grain held for export at New York; and to increase to 0.07 cent per bushel per day the storage charges on grain held for export at Portland and Boston. The effect of these proposed changes would have been to equalize rail rates, free time storage allowance, and storage charges on ex-lake grain from Buffalo for export through Portland, Boston, New York, Philadelphia and Baltimore. On protest of the port interests in Baltimore and Philadelphia and the railroads serving those cities, the Commission suspended the proposed schedules pending an investigation into their lawfulness. After hearing and review by the Commission, it issued its order cancelling the schedules, upon an

ultimate finding "that the proposed schedules have not been shown to be just and reasonable except the proposed increase in free storage time at New York, which we find just and reasonable." (278 I.C.C. at 39.) No objection has been made here to this increase in free storage time. As to the proposal to increase storage charges at Boston and Portland, it was indicated at the hearing before the Commission that this was a concession advanced only for the purpose of bringing about complete equalization among the ports, and that the plaintiffs did not desire the increases if the proposed rail-rate reductions were not permitted. Since the lower storage charges at Boston and Portland are considered a competitive advantage to those cities, the Baltimore and Philadelphia interests would of course have no objection to the increase therein. Consequently, the only question before this court is the correctness of the Commission's holding on the proposed rate reductions to Albany, Boston, New York and Portland.

The existing differential on ex-lake grain of 0.5 cent per hundred pounds in favor of Baltimore and Philadelphia under New York and Boston was established by the railroads in 1905, upon the recommendation of the Commission. In the Matter of Differential Freight Rates to and from North Atlantic Ports, 11 I.C.C. 13 (1905).[1] Prior to that time there had been intense carrier competition both for the ex-lake grain and for grain which was shipped entirely by rail (hence, "all-rail grain") from central and western territories, and the many rate agreements entered into by the carriers with regard to this traffic had invariably proved ineffective. In the 1905 proceeding the Commission, at the request of the competing carriers, sought to arbitrate the dispute and to arrive at rate relationships which would be fair to all the ports. As the Commission stated (11 I.C.C. at 66) : "The rates are to be so adjusted that there can be fair competition for this business via all the ports, so that no one shall possess a distinct advantage over the other."

[1]. As to the rates to Albany, see Albany Port District Commission v. Ahnapee & Western Ry.Co., 219 I.C.C. 151(1936).

In the 1905 proceeding, the Commission concluded that on the all-rail grain, Philadelphia should be given a 1.0-cent differential, and Baltimore a 1.5-cent differential, under New York and Boston. These differentials were apparently intended partly to give effect to the shorter rail distances to Baltimore and Philadelphia, and partly to offset the lower ocean rates which prevailed from Boston and New York. The all-rail differentials are still in effect, and are not under attack here. As the Commission pointed out in the instant case (278 I.C.C. at 33 note 4), the ex-lake and all-rail differentials, though originating in the same proceeding, no longer bear any relationship to each other. They are not competing routes, since the all-rail grain originates principally in the central United States producing area, while the ex-lake grain is largely from Canada or from northwestern United States. (278 I.C.C. at 33.)

On the ex-lake grain, the Commission stated in the 1905 report that Baltimore and Philadelphia had no substantial rail-distance advantage. See also Maritime Association of Boston Chamber of Commerce v. Ann Arbor Railroad Co., 95 I.C.C. 539, 571 (1925). The Commission's recommendation in 1905 of a 0.5-cent differential in their favor seems to have been based wholly on the ocean-rate advantage of Boston and New York. The Commission pointed out that the ocean rates fluctuated greatly and that it was almost impossible to say just how much those ·from Baltimore and Philadelphia exceeded those from New York and Boston, but it thought there was some difference, at least 0.5 cent per hundred pounds. (11 I.C.C. at 23–25, 75.) In the light of the objective sought in the proceeding, quoted above, the Commission must have concluded that, because of the ocean-rate differences, Baltimore and Philadelphia needed a rail-rate differential fairly to compete.

While the differential on· ex-lake grain has been in effect since 1905, it has by no means been acceptable to all parties at all times. Indeed, the commercial and port interests at nearly every port involved have attacked the differential on one or more occasions. Chamber of Commerce of State of New York v. New York Central & Hudson River Railroad Co., 24 I.C.C. 55 (1912); Maritime Association of Boston Chamber of Commerce v. Ann Arbor Railroad Co., 95 I.C.C. 539 (1925), rehearing 126 I.C.C. 199 (1927); Baltimore Chamber of Commerce v. Ann Arbor Railroad Co., 159 I.C.C. 691 (1929); Port of New York Authority v. Baltimore & Ohio Railroad Co., 248 I.C.C. 165 (1941). In each of these proceedings the Commission held the differential to be not unlawful and refused to change it. It should be noted, however, that in all of these attacks the Commission was asked to declare the existing differential unlawful; for the first time, in the instant proceeding, has the Commission been asked to find that a change in the differential proposed by one of the competing groups of railroads would be unlawful. Heretofore, the Commission has only had to decide whether to permit the carriers to maintain the differential; here the Commission has ordered the carriers to maintain the differential, or at least not to reduce it. It should also be noted that no order was or, according to the Commission's report, could have been, entered in the 1905 proceeding; the establishment and maintenance of the differential has up to now been entirely voluntary on the part of the railroads.

The Commission's decision is attacked here as being erroneous in law, unsupported by essential basic findings, and unsupported by substantial evidence on the record as a whole.

 The primary position taken by plaintiff railroads is that carriers are free to adjust their rates to meet competition, so long as the adjusted rates are within the "zone of reasonableness" and result in no undue prejudice or preference or discrimination prohibited by the statute. While the Commission has in its brief made an extended argument attacking this position, we think the plaintiffs' statement of the principle is sound and is adequately supported by authority. United States v. Chicago, M., St. P. & Pac. Railroad Co., 1935, 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023; Texas & Pac. Ry. Co. v.

United States, 1933, 289 U.S. 627, 635–37, 53 S.Ct. 768, 77 L.Ed. 1410. The Commission itself has previously recognized, even in cases involving the ex-lake grain differential, that carriers may lawfully make voluntary rate adjustments which the Commission could not require them to make. Galveston Commercial Association v. Abilene & Sou. Ry. Co., 109 I.C.C. 114, 121, 125 (1926); Port of New York Authority v. Baltimore & Ohio Railroad Co., 248 I.C.C. 165, 180 (1941); Ex-Lake Grain from Ogdensburg to New England, 208 I.C.C. 385, 391 (1935). See also Maritime Association of Boston Chamber of Commerce v. Ann Arbor Railroad Co., 126 I.C.C. 199, 211 (1927). Of course, under 49 U.S.C.A. § 15(7), the plaintiffs had the burden of proof before the Commission to show that the proposed rate was "just and reasonable". "Conversely, the proposed schedule must be upheld as lawful unless adequate reasons are presented for finding it contrary to the statute." Office Supplies from Gloucester, Mass., to Chicago, 245 I.C.C. 669, 673 (1941).

To sustain their burden of proof and to support their claim that rate equalization is necessary if they are to meet competition, plaintiffs first showed, and the Commission found, that while New York had once had a preponderance of the ex-lake grain traffic from Buffalo for export, varying in the years 1930–1938, for example, from 68.33% to 100%, beginning in 1939 there had been a progressive decrease in New York's proportion of this traffic until in 1948, the last year for which full data was included in the record, it amounted to only 17.61%. During this same period, Baltimore's percentage, which had amounted to only 1.97% to 13.94% in the early thirties, showed a large increase beginning in 1938 until it amounted to 46.20% in 1948. Philadelphia, which had been on about an equal basis with Baltimore in the early thirties, also has had a considerable increase, particularly since 1943, and its proportion in 1948 was 26.01%. The railroads serving New York thus contend that the 0.5-cent differential has resulted in a great loss of traffic to them over the last twelve years and that removal of the differential is necessary

if they are to compete. Boston has not had any great proportion of this ex-lake grain since the first World War, and the percentages have fluctuated rather violently from year to year. In the thirties, the percentage varied from zero for several years to 13.91%, and the situation has been much the same since 1939, though starting with 1945 it has been somewhat more consistent, with 10.16% in 1948. Portland apparently has never had any of the ex-lake grain and was not included in the tariff until 1947. The railroads serving these ports claim that as long as the 0.5-cent differential in favor of Baltimore and Philadelphia exists they can get little or none of this grain traffic.

It is of course clear that the 0.5-cent differential cannot be the sole cause for the diversion of traffic to Baltimore and Philadelphia in recent years, for despite this rate disadvantage New York maintained a dominant position from 1905 to 1939. But the plaintiffs contend, and this contention was apparently accepted by the Commission, that various factors have operated together over the last twelve years to make the differential much more important than it had previously been. Thus, the Commission and the parties agree that while New York and Boston at one time had an advantage in ocean rates which offset the rail differential, the steamship lines have in general, at least since 1935, quoted the same rates from all the North Atlantic ports. Whereas formerly the total transportation cost from the inland point of origin to the foreign destination was about the same through all the ports, after 1935 the total cost was 0.5 cent per hundred pounds less through Baltimore and Philadelphia. This finding, we think, is highly significant, for, as pointed out above, the only clear ground advanced by the Commission in the 1905 proceeding for recommending the 0.5-cent differential on ex-lake grain was that it would offset the ocean-rate disadvantage of the ports of Baltimore and Philadelphia. (See 11 I.C.C. at 75.)

Another factor found by the Commission to have helped bring about the shift in traffic was a change in marketing practices. Formerly the shipment of grain was controlled by private commercial exporters

who shipped mainly in parcel lots. Today most of the grain is shipped by the United States and British governments, both of which ship in much larger quantities, usually full cargoes. This change in export control is important for a variety of reasons. In the first place, it has rendered less valuable the advantage which New York has always had in good regular liner service, with frequent and direct sailings to all foreign ports. The commercial parcel-lot exporter is greatly influenced by this frequency of sailings, but since the American and British governments ship in such large quantities they utilize tramp steamers for the most part and the frequency of liner service is of considerably less importance to them. Also, there was uncontroverted testimony by government witnesses before the Commission, though no finding was made with respect thereto, that the government agencies are under rather strict instructions to use the cheapest transportation available; hence, they always favor Baltimore and Philadelphia and use New York, Boston and Portland only as overflow ports when Baltimore and Philadelphia are too congested. Finally, the superior storage facilities at Baltimore, and Philadelphia[2] are of greater significance under the present export system, for they further the necessary accumulation of large quantities of grain for full-cargo shipment.

In addition to the above evidence and findings indicating the importance of the differential and the necessity for its removal if plaintiff railroads are to compete for the ex-lake grain traffic, plaintiffs relied on various other evidence to sustain their burden of proof of showing that the proposed rate changes were just and reasonable. For example, on ample and apparently uncontroverted evidence, the Commission found (278 I.C.C. at 33): "On classes and commodities generally, other than grain, the export rates from Buffalo are the same to New York, Boston, and Port-

land as to Philadelphia and Baltimore." In the absence of some considerations which would distinguish the ex-lake grain from the other commodities, this finding should furnish strong support for the reasonableness of the proposed rates.

There was further uncontroverted evidence, though the Commission failed to make any finding with respect to it, that the proposed rates would be 2.68 cents per hundredweight higher than the minimum rates set by the Commission in 1939 on this grain from Buffalo to New York, Ex-Lake Grain to North Atlantic Ports, 235 I.C.C. 415, even when the subsequent general increases affecting all rates are added on to this minimum.

In addition, the plaintiffs introduced evidence, though here again the Commission made no finding, to show that, because of the great shift in the grain traffic to Baltimore and Philadelphia, they must use much of their equipment in transporting grain to those cities, although their shares, in the division of the rate for those hauls, make for much lower per car-mile earnings than they would receive on transportation over their own lines to New York and Boston, even after the 0.5-cent reduction in rates.

Certainly, on all this evidence the plaintiffs established prima facie that their proposed schedule of rates was just and reasonable. We now turn to the Commission's report to try to find the basis for its holding that the proposed rates should be disallowed.

 In Beaumont, S. L. & W. Ry. Co. v. United States, 1930, 282 U.S. 74, 86–87, 51 S.Ct. 1, 75 L.Ed. 221, the Supreme Court, while upholding a Commission order, took occasion to criticize the Commission for the unnecessary burden cast upon the reviewing court by the failure of the Commission to include in its report a complete statement showing the grounds upon which its determinations rested. Just how far the Com-

2. In 1905, New York had an elevator capacity of 10,750,000 bushels, which far exceeded that at any of the other ports. Today Baltimore leads with 12,123,000 bushels, Philadelphia has a 4,750,000-bushel capacity, and New York has dropped to third place with 4,500,000. Boston and Portland each has 1,500,000.

mission is obliged by statute to go in this particular is not so clear as it might be. The Commission does have the duty to set forth in its report the "basic" or "essential" or "quasi-jurisdictional" findings necessary to support its ultimate conclusion, though it must be recognized that such requirement is sometimes obscured in vague questions of degree. United States v. Chicago, M., St. P. & Pac. Railroad Co., 1935, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; United States v. Baltimore & Ohio Railroad Co., 1935, 293 U.S. 454, 463, 55 S.Ct. 268, 79 L.Ed. 587; Florida v. United States, 1931, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. At least it can be said that the Commission does not fulfill its duty, in a case such as the present one, if it does no more than state as its ultimate conclusion that "the proposed schedules have not been shown to be just and reasonable". Should a carrier fail to appear or to offer any evidence in support of a proposed rate, perhaps a conclusion, such as the one above, that the carrier had failed to sustain the burden of proof imposed upon it by § 15(7) would be a sufficient basis for holding the rate unlawful. See Powdered or Flaked Milk from Vermont to Boston, 246 I.C.C. 522 (1941). But where, as here, the carrier has presented impressive evidence to support the proposed rate, the Commission may not hold the rate unlawful upon the mere statement that the carriers have not sustained their burden of persuasion. As stated in United States v. Pierce Auto Freight Lines, Inc., 1946, 327 U.S. 515, 533, 66 S.Ct. 687, 90 L.Ed. 821, an ultimate finding is not enough in the absence of a basic finding to support it. Where the ultimate finding, as here, is in the negative form, the report must contain sufficient basic findings of fact to warrant a reviewing court in concluding that the Commission was not without rational grounds for refusing to find, as the case might be, that the proposed schedules are "just and reasonable" within the meaning of § 1(5) of the Act, or are free of "unjust discrimination" prohibited by § 2, or contain no undue or unreasonable preference, prejudice or disadvantage, within the prohibitions of § 3(1). United States v. Chicago, M., St. P.

& Pac. Railroad Co., 1935, 294 U.S. 499, 506–508, 55 S.Ct. 462, 79 L.Ed. 1023. And these basic findings should be clearly stated and identified as such, so that the reviewing court will not be groping in the dark as to the grounds for the Commission's ultimate conclusion. See the last-cited case, 294 U.S. at pages 510–511, 55 S.Ct. at page 467.

So far as the report discloses, the only possible difference in cost of service which might be suggested as a basis for requiring a higher rate to New York than to Baltimore and Philadelphia arises from the differences in terminal operations at these ports. In its report, the Commission states (278 I.C.C. at 38): "As pointed out by division 3 in the 1941 report, a lower rate to Philadelphia and Baltimore than to New York is not warranted by consideration alone of relative distances, but the terminal operations at New York are sufficiently different from those at Philadelphia and Baltimore to warrant the existing differential."

From the report, which is adequately supported by the record on this point, it appears that the tariffs as published apply to shipside—that is, there is no additional charge to the shipper at any of the ports except for the elevation or loading into the ship. This elevation charge is the same at all the ports, though at Baltimore and Philadelphia the railroads perform the service and receive the compensation, while in New York the elevation is performed and the remuneration received by an independent floating-elevator company, or by the New York Port Authority at its Gowanus Bay elevator. The actual physical handling of the goods, however, is quite different. In Baltimore and Philadelphia, the boxcars are brought to elevators owned by the railroads, the grain is elevated and stored in the elevators, and then loaded directly into ships by means of spouts. In New York, on the other hand, the grain is usually unloaded from the cars into the railroad's grain boats, stored in the boats until time to load on the ship, and then lightered at railroad expense to the floating elevator at shipside. There are some variations in this procedure. The New York Central and the Lehigh Valley, for example, have

elevators on the Jersey side, but the grain is lightered from the elevators to shipside. At one time, apparently, ships did come to these elevators and load directly, but the witnesses testified that there had not been sufficient grain in the last few years to make it worth while; also this direct-loading system is probably more appropriate for full cargoes. When the New York Port Authority's Gowanus Bay elevator is used, there is direct loading into the ship, but no rail lines connect with the elevator and the grain is lightered at railroad expense from the cars to the elevator.

The difference in physical operations might indicate that the rates to the ports would not have to be the same; to that extent, the Commission's statement that the terminal operations are sufficiently different "to warrant" the differential may well be accurate. And of course this was all the Commission had to decide in the 1941 proceeding, for there the carriers were defending the differential against attack by the New York port interests. Port of New York Authority v. Baltimore & Ohio Railroad Co., 248 I.C.C. 165 (1941). The present proceeding is quite different. Here it was not sufficient for the Commission to find that the dissimilar terminal operations *warrant* the carriers in maintaining a differential; the Commission had to find something more, namely, that the difference in terminal operations *requires* the carriers to maintain the differential in order to avoid violation of some specified section of the statute. The Commission made no such finding.

There was no finding, and no basis in the record for a finding, that this greater terminal service would make the proposed rates to New York noncompensatory or so low as to burden other traffic or in some other particular to violate § 1(5). Indeed, in view of the uncontroverted evidence that the new rate would be well in excess of the minimum previously set by the Commission, any finding of such violation of § 1(5) would be difficult to sustain.

Nor was it found in the report that the proposed rate equalization would be unjustly discriminatory as to shippers, in violation of § 2. The shipper does not receive any more for his money because of the greater terminal service at New York; he gets his grain moved from Buffalo to shipside at each of the North Atlantic ports, however that is accomplished in the particular port.

Finally, the Commission did not find that, because of the difference in terminal operations, equalization of rates would unduly prejudice Baltimore and Philadelphia or unduly prefer New York, in violation of § 3(1). It is conceivable that the railroads serving New York absorb a greater amount of expense out of their line-haul rate than do the Baltimore and Philadelphia railroads and thus under a system of equal rates would receive a lower net return. But on the record before the Commission and the history of the differential, a holding of undue prejudice on the basis of terminal costs would not have been warranted. As pointed out previously, such costs played no part in the establishment of the differential by the Commission in the 1905 proceeding, and the record contains no evidence indicating the relative costs of serving the various ports or what relation those costs bear to a differential of 0.5 cent. The Commission has frequently stated in the past, in refusing to change the differential, that neither comparative distances nor terminal operations are of controlling importance. See Baltimore Chamber of Commerce v. Ann Arbor Railroad Co., 159 I.C.C. 691, 696 (1929); Port of New York Authority v. Baltimore & Ohio Railroad Co., 248 I.C.C. 165, 175–76 (1941). Indeed, when New Jersey claimed that the lighterage system in New York harbor was unduly prejudicial to New Jersey and introduced evidence tending to show that the expense of the lighterage system on all cargo considerably exceeded that for direct loading, the Commission refused to require the New York railroads to make any extra charge for the service. State of New Jersey v. Baltimore & Ohio Railroad Co., 245 I.C.C. 581 (1941). See also Baltimore Chamber of Commerce v. Ann Arbor Railroad Co., supra. Certainly some more definite statement would have to be made in the report to justify us in inferring that the Commission had intended to depart

from its prior decisions and to hold that the rates to New York, Philadelphia and Baltimore would be unduly preferential or prejudicial unless they reflected the difference in the cost of the terminal service rendered, and that 0.5 cent per hundred pounds was an accurate reflection of that difference in cost.

The same difficulties are presented with respect to the only statement in the report which might be suggested as a possible cost-of-service ground for cancelling the proposed rates to Boston and Portland. The Commission states (278 I.C.C. at 37): "The terminal services at Boston and Portland are not materially different from those at Baltimore and Philadelphia, but the distances from Buffalo to Boston and Portland are, respectively, 69 and 141 miles greater than to New York, and 63 and 135 miles greater than the average of the distances to Baltimore and Philadelphia. Because of these substantially longer hauls to Boston and Portland than to New York, which so far as appears are at least not more than offset by the greater terminal service at New York than at the other two ports, it is apparent that the transportation conditions afford no warrant for more favorable treatment of Boston and Portland than of New York."

The "distances" referred to by the Commission are the short-line tariff distances from Buffalo, set out in a chart printed in the report (278 I.C.C. at 34); they are not necessarily the average working distances to the ports,[3] and offer little indication of the comparative costs to the carriers serving the various ports. No such cost data appears in the record.

Here again, the proposed rates would exceed the minimum previously set by the Commission; the Commission did not find that they would be noncompensatory or so low as to burden other traffic; the Commis-

sion did not find that they would result in undue prejudice to Baltimore and Philadelphia. It merely found that the longer hauls to Boston and Portland than to New York precluded giving Boston and Portland more favorable treatment than New York. Of course, if the Commission was in error in cancelling the proposed schedule of rates to New York, this particular reason for cancelling the proposed rates to Boston and Portland, even if otherwise a valid one, necessarily falls to the ground. Moreover, the Commission has previously stated that the difference in distance to Boston was not of sufficient magnitude to require a higher rate than to Baltimore and Philadelphia. Maritime Association of Boston Chamber of Commerce v. Ann Arbor Railroad Co., 95 I.C.C. 539, 571–72 (1925).

■ The statement in the report which looks most like a finding of violation of the statute, and which has been the chief target for attack by the plaintiffs as well as by dissenting Commissioner Mahaffie, was apparently intended as an answer to the plaintiffs' contention that the present proceeding in which they initiated a proposal to wipe out the port differential must be distinguished from the 1941 proceeding where they had been defendants opposing equalization. The Commission stated (278 I.C.C. at 38): "The status of the carriers as respondents in a suspension proceeding, instead of defendants in a complaint proceeding, does not relieve them of the burden of showing that the proposed rates are just and reasonable, and this burden includes rebuttal of any evidence tending to show that equalization as proposed would have an effect upon the movement of traffic that would be unjust to Baltimore and Philadelphia."

The meaning of this sentence is not entirely clear. Surely, the Commission did not intend to say, as Commissioner Ma-

3. From an exhibit filed by plaintiffs it appears that the short-line tariff distances bear little relation to the average working distances, as can be seen from the following figures, with the short-line tariff distances from Buffalo in parentheses: Albany 358 (297); New York 467 (406); Baltimore 562 (402); Philadelphia 447 (421); Boston 550 (475); and Portland 602 (547). The average working distance to Baltimore is thus greater than that to Boston and only 40 miles less than that to Portland. There was also evidence to show that the distance over the B. & O. from Buffalo to Baltimore is 582 miles and the average of the Western Maryland routes to Baltimore is 577 miles.

404

haffie apparently construed the remark, that the burden of showing a rate reduction to be just and reasonable includes the burden of proving that it will result in no diversion of traffic from one port to another. That would in effect be requiring the carriers to show that the reduction they proposed would be futile. Perhaps the use of the word "unjust" in the sentence quoted would imply that carriers in an effort to meet competition could reduce rates to bring about some diversion, but not too much. In any event, the statement falls short of an express finding that the proposed rate equalization would result in such a drastic diversion of traffic as to work undue prejudice to Baltimore and Philadelphia and thus to violate § 3(1), the only section of the statute specifically dealing with the matter of port relationships. Hence, we think it is not a sufficient basic finding to support the Commission's ultimate conclusion.

■ Even if the statement is treated as a finding that rate equalization would produce such extensive diversion of traffic as to prejudice unduly the ports of Baltimore and Philadelphia, such finding is not supported by substantial evidence on the record as a whole. Administrative Procedure Act, § 10(e), 5 U.S.C.A. § 1009(e); cf. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456. The objections which the B. & O. and other intervening defendants advanced before the Commission were wholly to the effect that if the rates were equalized, Baltimore and Philadelphia could not compete equally with New York when "normal" times return, that is, when the governments of the United States and Great Britain cease to control the grain movement, and the traffic reverts to commercial exporters who ship in parcel lots rather than in full-cargo lots. It was not suggested that such inability to compete was anticipated so long as the present "abnormal" conditions exist; and a witness for Commodity Credit Corporation testified that, under present conditions, he did not foresee "any drastic or widespread diversion of this traffic" as a result of the proposed equalization. That it was this possible future situation which the Commission was considering is borne out by its earlier paragraph of findings (278 I.C.C. at 37): "There appears to be no dissent from the expressed view that the Government will gradually relinquish its position as the principal shipper of export grain, and that grain shipments in the future will be increasingly in parcel lots, in which event New York, with its more frequent and direct sailings, will again benefit as the logical port for such shipments. The normal movement of grain is in parcel lots, and New York has been and will continue to be the predominant port for the exportation of parcel-lot grain. Philadelphia and Baltimore are primarily cargo-lot ports, and were the 0.5-cent differential eliminated there would be no important inducement to a private exporter to select either of these ports as an outlet for parcel lots of grain."

■ Evidence that at some time in the future under changed conditions New York might have too great a competitive advantage if the rates are equal is not a sufficient basis for finding that such equalization must now be denied on the ground of undue preference or undue prejudice. The Commission must of course always look ahead in making a finding that undue prejudice would result from a given course of conduct; but there should be a certain immediacy to that future effect. And on the record in this case there could certainly be no basis for finding that the return to "normal conditions" would take place in the near, or even in the foreseeable, future. None of the witnesses on either side would hazard a guess as to when conditions might change, and a witness from the Department of Agriculture testified: "Though the world food situation can probably no longer be regarded as critical there still appears a need during the next few years for continued very large exports, though perhaps somewhat reduced from the last two or three years." Should future changes in conditions cause the rate equalization to result in undue prejudice, the Commission can correct the situation at that time.

The protesting railroads offered no suggestion whatever that equalization of rates now or at any time in the future would

bring about such a diversion of traffic as to result in undue preference to Boston and Portland, and the above-quoted paragraph in the report, which is apparently subsidiary to the finding of "unjust" effect on traffic, does not mention these two cities. Indeed, in the light of plaintiffs' showing that Boston has had only an inconsequential amount of this grain over the years and Portland has apparently had none, it would be difficult to conceive of their obtaining such a large share of the traffic that undue prejudice would result to Baltimore and Philadelphia. As far as the record shows, Boston and Portland do not have any advantage as to more frequent or direct sailings, such as New York is claimed to have, and Boston and Portland do not appear to have any other advantage which must be offset by a differential. Apparently, the only advantage Boston ever had was the lower ocean rate, which the Commission found no longer exists.

 Finally, we do not think the Commission's ultimate conclusion is adequately supported by its statement that an "important and long-standing adjustment such as the one under consideration should not be changed to meet conditions of a temporary nature, even though somewhat protracted and of uncertain duration, unless it clearly appears that the transportation standard has been departed from and that injury has resulted from such departure." (278 I.C.C. at 37–38.) While the Commission may properly consider the "long-standing" nature of a differential as a factor in refusing to upset it or allow it to be changed, see I.C.C. v. Louisville & N. Railroad Co., 1913, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431, age alone seems an insufficient reason for denying a carrier the right to change a differential. See United States v. Chicago, M., St. P. & Pac. Railroad Co., 1935, 294 U.S. 499, 507–508, 55

S.Ct. 462, 79 L.Ed. 1023. During the long period of its existence, the differential has been under frequent attack, and although in all these proceedings the Commission has found the differential lawful, it has not since 1905 held or even suggested that 0.5 cent is the only proper differential. Always, it has commented on the age of the differential and refused to take any action toward changing it. Even the possibility that a rate war might result from a change in a long-standing adjustment has been considered an insufficient justification for the Commission's refusal to allow a carrier to alter the rate relationship, since the Commission has adequate power to deal with such a situation should it arise. See United States v. Chicago, M., St. P. & Pac. Railroad Co., supra, 294 U.S., at page 509, 55 S.Ct., at page 466. Here there has been no real threat of any rate war. The only suggestion of such a possibility was the statement made at the close of the hearing before the Commission by counsel for the B. & O. that, if the reduction was allowed, that carrier would propose a like reduction in its rates to maintain the differential; no such statement was made on behalf of any of the other carriers.

 We conclude, therefore, that the Commission's decision lacks the support of adequate findings and substantial evidence, and must be set aside. We find it unnecessary to pass on the plaintiffs' additional contention that, since export rates on all other commodities from Buffalo are the same to all the ports, the rate equalization on ex-lake grain proposed here is in fact required by the Jones Amendment, 54 Stat. 902, Act Sept. 18, 1940, now § 3(1a) of the Interstate Commerce Act.[4]

A judgment will be entered setting aside the order of the Interstate Commerce Commission.

4. "It is hereby declared to be the policy of Congress that shippers of wheat, cotton, and all other farm commodities for export shall be granted export rates on the same principles as are applicable in the case of rates on industrial products for export. The Commission is hereby directed, on its own initiative or an application by interested persons, to make such investigations and conduct such hearings, and, after appropriate proceedings, to issue such orders, as may be necessary to carry out such policy."