George P. BAKER et al.

v.

UNITED STATES of America and Interstate Commerce Commission.

Civ. A. No. 71–154.

United States District Court,
E. D. Pennsylvania.

Feb. 16, 1972.

J. T. Clark, Cleveland, Ohio, John A. Daily, New York City, Paul R. Duke, James E. Frick, Philadelphia, Pa., Rene J. Gunning, Baltimore, Md., Richard W. Kienle, Norfolk & Western Railway Co., Roanoke, Va., Charles N. Marshall, Baltimore, Md., Charles W. Mulcahy, Jr., Boston, Mass., for plaintiffs.

Richard W. McLaren, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Louis C. Bechtle, U. S. Atty., Henry J. Horstmann, Asst. U. S. Atty., Philadelphia, Pa., for the United States.

Fritz R. Kahn, Gen. Counsel, Geraldine R. Keyes, Atty., I.C.C., Washington, D. C., for the I.C.C.

Before ADAMS, Circuit Judge, and VAN ARTSDALEN and GORBEY, District Judges.

## OPINION

GORBEY, District Judge.

Plaintiffs, a number of railroads servicing the Northeastern part of the United States, ask us to deny enforcement of certain orders entered by the Interstate Commerce Commission (Commission) in Increased Waterborne Charge, North Atlantic, Pacific and Canadian Ports. 337 I.C.C. 534 (1970).[1] Specifically, the Commission found that a proposed increase, as set out in tariff schedules published by plaintiffs, had not been shown to be just and reasonable. Plaintiffs had proposed an increase in the charge from 12 cents to 16

---

1. Jurisdiction is properly invoked under 28 U.S.C. §§ 1336, 2284, 2321–2325. Venue is proper in accordance with 28 U.S.C. § 1398. On December 1, 1971, a three-judge court from the Eastern District of Minnesota ordered dismissed a similar complaint brought by six Western railroads challenging the same Commission decision, finding support in the record thereof.

cents per hundredweight on waterborne traffic moving through the North Atlantic ports.[2]

The plaintiffs were originally opposed by the United States and the Interstate Commerce Commission. Certain North Atlantic port interests[3] and certain shippers[4] sought and were granted leave of court to intervene as defendants under 28 U.S.C. § 2323 and Fed.R.Civ.P. 24(a).

Preliminarily, we shall examine the history of the waterborne charge. In 1958, as part of the general rate proceeding, the railroads proposed a new charge of 6 cents per hundredweight to the line-haul rates on export, import, coastwise and intercoastal freight moving through all United States ports. The Commission concluded that the respondent railroads had met their burden of proof and that the new charge and the resulting line-haul rates on such waterborne traffic were just and reasonable and otherwise lawful. Increased Freight Rates, 1958, Ex Parte 212, 304 I.C.C. 289 at 356. The waterborne charge has been increased three times since 1958. In 1960, as part of a general rate proceeding, the Commission, finding no probable cause for suspension or investigation, permitted a proposed 1 cent increase in the waterborne traffic charge to become effective. In 1965 and 1967, increases of 2 cents and 3 cents respectively were permitted to become effective, the Commission filing no reports, making a grand total of 12 cents per hundredweight in the waterborne charge.

Since the general rate increase in 1960, there have been five general increases in the total line-haul rate.[5]

■ Broadly, the issue before us is whether the Commission's report and order can withstand the court's scrutiny under 5 U.S.C.A. § 706.[6] The scope of judicial review of administrative deci-

2. Under § 15(7) of the Interstate Commerce Act, the proposed increase was suspended while the Commission investigated. In a report issued on August 25, 1970, the Commission ordered the tariff containing the 4 cent increase be cancelled on or before October 12, 1970. Under § 17(8) of the Act, that order was stayed pending petitions for reconsideration. On January 5, 1971, the carriers' petition for reconsideration was denied and the tariffs again were ordered cancelled. On January 20, 1971, this court signed an order staying the cancellation of the tariffs and immediate refund of any increases collected, pending hearing and determination by this court. While the charge at issue is presently being collected, for convenience, it shall be referred to as the proposed charge.

3. Delaware River Port Authority, Maryland Port Authority, Massachusetts Port Authority, North Atlantic Ports Association, Inc., The Port of New York Authority and Virginia Port Authority.

4. Darling and Company, Detroit Rendering Company and Harchem Division, Union Camp Corporation.

5. Increased Freight Rates, 1967, Ex Parte 256, 329 I.C.C. 854, 332 I.C.C. 280; Increased Freight Rates, 1968, Ex Parte 259, 332 I.C.C. 590; Increased Freight Rates, 1969, Ex Parte 262, 337 I.C.C. 436; Increased Freight Rates, 1970, Ex Parte 265 and Increased Freight Rates, 1971, Ex Parte 267, 339 I.C.C. 125.

6. "Scope of Review. To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance or procedure required by law;

(E) unsupported by substantial evidence in a case subject to §§ 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

sions is commonly described as being limited to the requirement that there be substantial evidence on the record to support agency findings. Substantial evidence has been characterized as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Even if we should find the weight of the evidence against the Commission's decision, this would not, in itself, be sufficient for reversal. Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). A finding of substantial evidence must, however, be based on the record as a whole and not merely on that part which happens to be favorable to the agency's finding. Universal Camera v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ However, this court's function in reviewing the Commission's determination is sharply restricted. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). Particularly compelling is this restrictive standard when the order the court is asked to review concerns the justness, reasonableness and lawfulness of railroad tariffs. Eastern Express, Inc. et al. v. United States et al. (S.D.Ind. 1961), 198 F.Supp. 256, aff'd 369 U.S. 37, 82 S.Ct. 640, 7 L.Ed.2d 548. Such judgments and the economic considerations necessarily entailed therein have

been entrusted by Congress to the Commission subject to our limited review.

Statute mandates that the burden of proving the reasonableness of a change in rates is on the parties proposing the change. 49 U.S.C. § 15(7).

■ It is the Commission's duty under law to set forth the basic or essential findings to support its ultimate conclusion.[7] Where the ultimate conclusion is, as here, a negative one, that the railroads have not sustained their burden, that determination need only be supported by such basic findings of fact to warrant a reviewing court to conclude that the Commission was not without rational grounds for refusing to find the proposed tariffs just and reasonable within the meaning of the Interstate Commerce Act.[8] New York Central R. Co. v. United States, 99 F.Supp. 394, 401 (D.C.Mass.1951), aff'd, I.C.C. v. New York Central R. Co., 342 U.S. 890, 72 S. Ct. 201, 96 L.Ed. 667 (1961).

The Commission determined that port terminal services associated with waterborne traffic had substantially decreased since the additive had been approved in 1958. 337 I.C.C. 534, 540–541. The record amply supports this basic finding. Certain marine terminal facilities owned by the plaintiff carriers in 1958 at the ports of Baltimore, Boston and Philadelphia have been sold, leased out, or are inactive at the present time. (Exhibit no. 6, p. 2; Exhibit no. 30, pp. 2–3; Exhibit no. 31, p. 31) As compared to 1958, the performance of certain terminal services associated with waterborne traffic has decreased.[9] In Ex Parte 223, *supra*, at 416, the Com-

---

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

7. 5 U.S.C.A. § 557(c).

8. 49 U.S.C. § 1(5).

9. In the past dozen years free time on waterborne export traffic has been reduced from 7 to 5 days (Exhibit no. 34, pp. 9–10, TR. 67–69). Since 1958, a tariff of $37.-

08 per car has been charged for blocking and bracing on import traffic. (*e. g.* a car loaded with 80,000 lbs., braced and blocked at $37.08, would yield to a carrier 4.6 cents per hundredweight more than in 1958.) Between 1965 and 1970 the carriers discontinued loading and unloading at Boston. In 1958 two free deliveries were provided on split deliveries at New York on export freight; today, only one is delivered without charge. (Exhibit no. 34, pp. 11–12).

mission permitted the proposed 1 cent increase to become effective finding "there has been no change in their port operations, but the costs of performing the services have risen substantially by reason of increased wages of railroad employees, increased rates paid to contract stevedores and increased port facility maintenance expenses." The record demonstrates that at least with regard to port operations this is not the situation at present.[10]

While it may be admirable that the carriers have attempted to reduce costs associated with waterborne freight, it does not appear from the record they considered that fact in their cost presentation to the Commission. That adjustments for changing conditions should be made was recognized in Cancellation of Wharfage Absorption, 335 I.C.C. 477, 526–527 (1969) where the Commission stated:

"For respondents now to eliminate absorption of wharfage, which, among other port terminal expenses was a factor found to warrant the additive, without adjustment of the latter, would not be just and reasonable."

■ The carriers argue that the increase in stevedore costs alone is sufficient to establish need for the proposed increase. The Commission concluded that this as well as other data presented by the carriers was "inconclusive" and found an "absence of clear and precise representative cost evidence demonstrating a need for additional revenues," Increased Waterborne Charge, *supra*, at 541. This finding is amply supported by the record or, to be more precise, from the absence thereof. For example, the carriers did not present the Commission with the unit costs of waterborne tonnage; nor was there a showing of the revenues received by the carriers for waterborne traffic services. The Commission could have been informed to what extent costs could have been reduced by the savings resulting from cancelled services. Furthermore, there was no attempt by the carriers to identify revenue accruing through assessment of the 12 cent additive increased by the general additives.[11]

■ Generalizing, the Commission could have rationally found from the record before it that there was no showing, that total revenues received on waterborne freight were inadequate, nor, that the total expense of providing all terminal operations on waterborne traffic had increased. We do not deem it the Commission's duty under 5 U.S.C. §

---

10. That port services have decreased to some extent at one port should not, in itself, be determinative. The services rendered at each port are, of course, not exactly the same. The Commission recognized this fact when it approved the original waterborne additive relying on the salutary principle of maintaining port rate relationships. See Increased Freight Rates, 1958, *supra*, at 356.

11. "Of crucial importance in considering the reasonableness of the proposed additive is the fact that the waterborne charge was originally established to help offset the cost of providing certain services and was to accrue to the carrier providing these services or absorbing the costs thereof. Currently, the charge provides added revenue for the line-haul carriers, due to the method of applying the charge. Prior to August, 1967, the waterborne charge was carried as a separate item readily identified and added to the base rate after all other increases had been included.

Thereafter, in the absence of a provision to the contrary, this procedure was reversed by incorporating the charge into the base rate and then increased as authorized in Ex Parte 256, Increased Freight Rates, 1967, 332 I.C.C. 280, Ex Parte 259, Increase Freight Rates, 1968, 332 I.C.C. 714, Ex Parte 262, Increased Freight Rates, 1969, 337 I.C.C. 436. Thus, where the port terminal carrier is also the inland carrier, the whole increase from the Ex Parte increase application goes to him. However, where there is more than one carrier involved, only part of the increase from the Ex Parte computation goes to the port terminal carrier as a result of the division of the total rate." Increased Waterborne Charge, *supra*, at 540. The Commission concluded, at 541, "the application of the waterborne additive, as described in the immediately preceding paragraph, weakens the justification for respondents' proposal."

556(c) to set forth in each and every particular, the manner in which the railroads' presentation was insufficient.

As part of their presentation, the carriers introduced Exhibit 13 to show that waterborne rates including the 16 cent charge were below the comparable domestic rates in the majority of cases. In the first instance, it has been held that domestic rates do not necessarily afford a proper measure for reasonable export or import rates. Texas and P. Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940. Moreover, the Commission could well have found the data unreliable as a basis for comparison when there was no showing of the conditions attending their establishment. While the comparison was probably a persuasive tool in 1958, here, the issue was whether the existing charge should be increased.

■ It is this court's holding that the Commission's decision contains adequate findings for it to have fairly concluded that the carriers failed to provide sufficient evidence of record that the costs of handling waterborne traffic at the ports exceed the present 12 cent charge plus increases presently applicable to waterborne traffic. Of course, the weight or inferences from any evidence presented is properly the prerogative of the Commission. Hughes v. United States, 278 F.Supp. 11, 14 (E.D.Pa.1967); United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1940).

■ In addition to being supported by substantial evidence, the Commission's decision must also meet the appropriate legal standards and correct legal criteria. The carriers contend that the Commission's present ruling, insofar as the quantum of evidence necessary, is not congruent with previous Commission rate proceedings. We recognize that to adopt different standards for similar situations is to act arbitrarily. Dixie Highway Express, Inc. v. United States, et al., (D.C.Miss.1965) 242 F.Supp. 1016.

Nevertheless, it is well settled that an administrative body is not bound by the rule of stare decisis, and inconsistency of its holding with prior holdings in and of itself does not make the decision capricious. Watkins Motor Lines, Inc. v. United States, et al., (D.C.Neb.1965) 243 F.Supp. 436. It appears to this court that to discuss consonance of Commission conclusions is to beg the primary question; whether the carriers sustained their burden in this proceeding. A reviewing court should not be required to discern whether the weight of data required to justify an increase has actually changed or rather whether the conditions under which the carriers justified the waterborne charge in the past have been so altered so as to require new representative cost evidence demonstrating a present need for additional revenues.

It is not a novel notion that administrative agencies regulate in a mutable society. In American Trucking Associations, Inc. v. Atchison, T. & S. F. Ry. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), the Court said:

"[T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. Compare SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); FCC v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946) . . . . [T]his kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of the regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and a fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the flexible limits of yesterday."

**337**

A thorough consideration of the entire record establishes that the Commission's ultimate conclusion was a rational one and supported by substantial evidence. We choose not to disturb it.

Accordingly, the temporary restraining order previously entered is vacated and plaintiffs' requested relief is denied.